# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| WILLIAM CONE, | ) |
| Petitioner, | ) |
| vs. | ) Case No. 11-0724-CV-W-GAF-P |
| LARRY DENNEY, | ) |
| Respondent. | ) |

## OPINION AND ORDER DENYING WRIT OF HABEAS CORPUS

Petitioner, a convicted state prisoner currently confined at the Crossroads Correctional Center in Cameron, Missouri, has filed pro se a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1997 convictions and 1998 sentences for six counts of first degree sexual assault and thirteen counts of first degree deviate sexual assault, which were entered in the Circuit Court of Lafayette County, Missouri. Petitioner raises four (4) grounds for relief. Respondent contends that all four grounds are without merit.

## FACTUAL BACKGROUND

In affirming the judgment of conviction and sentence, the Missouri Court of Appeals, Western District, set forth the following facts:

> The defendant began practicing psychiatry in West Plains, Missouri, in 1979. Rebecca and Jean were his patients. The defendant practiced until 1994 when, at 70 years old, he lost his license as a direct result of the facts recited herein. Subsequently, in January 1997, the defendant was charged by information with sexually assaulting Jean, and encouraging another person to do so on one occasion, and sexually assaulting Rebecca, both between November 1993 and January 1994. At trial, the defendant did not dispute that he engaged in sexual relations with both women. His contention at trial and on appeal was that the women were not "mentally incapacitated," as required for a conviction under § 566.040 and § 566.070. With respect to this issue, the state presented the testimony of three

experts, the two victims and several other witnesses. The defendant also testified. The evidence, which supports the verdicts, is as follows.

REBECCA

Rebecca first sought psychiatric treatment when she was 12 years old for problems related to a troubled childhood. In the Fall of 1993, Rebecca was involuntarily hospitalized by the defendant. She had been receiving treatment from the defendant since 1988, when she was 26 years old. He diagnosed her with bi-polar disorder, mixed type, borderline personality disorder, and substance abuse, primarily from her overuse of prescription medications. The hospital records showed that the defendant considered Rebecca's judgment so impaired that she could not make the decision to leave against medical advice. She was discharged from the hospital on September 26, 1993. The defendant's discharge notes stated that Rebecca had "poor judgment" and that her prognosis was "guarded." She was discharged with Prozac, Trazodone, Buspar, and Vistaril. It was a little over a month later that the defendant commenced having a sexual relationship with her.

Following this hospitalization, the defendant encouraged Rebecca to become more trusting by discussing sexual fantasies. The defendant's "treatment" progressed from discussion of sexual fantasies to actual sexual contact. The defendant's discussions about sex were timed to tragic past events in Rebecca's life that caused her to be distraught and upset. It was during this time that the defendant started his "reparenting" therapy as a prelude to their sexual relationship. In late 1993, the defendant told her that her condition was worsening and convinced her that if they had sex, it would help her treatment because she needed the nurturing she never received from her mother. The defendant gave her two pills and then they engaged in sexual intercourse and oral sex at his office. She testified that "[e]very time I saw him [after the initial sexual encounter] I had to give him oral sex" as part of the "nurturing process." She further testified that she did not enjoy the sexual contact, but believed it to be a part of her treatment. The sexual contact continued for approximately three months, until she got "high enough and drunk enough" to tell her family. On one previous occasion, while being forcibly medicated and restrained, Rebecca attempted to reveal the sexual aspects of her therapy. The defendant told her if she told anyone about the sexual aspect of her therapy, that he would have her involuntarily committed to a state mental hospital. She then tried to commit suicide.

Rebecca's psychiatric treatment with the defendant was very stormy. She was frequently angry and depressed, was using a variety of drugs and alcohol, and was often restrained, forcibly medicated and involuntarily hospitalized when she would not cooperate. She was involuntarily committed "several" times while under the care of the defendant.

During the treatment, the defendant prescribed Prozac, Trazodene and

2

Klonopin for Rebecca. The defendant would only provide her with medication (specifically, samples of Xanax) when she had "done a good job." On one occasion, the defendant showed Rebecca a gun that he kept in his office for "unruly patients." She took the incident as an implied threat and it frightened her because she considered herself to have been unruly. She testified that the defendant was her psychiatrist, but she also "trusted him as a father figure."

Dr. Stephen Jarvis, a board certified psychiatrist, was assigned by the Department of Mental Health to evaluate the defendant's patients. Dr. Jarvis reviewed the extensive medical records of both women, and the defendant's treatment notes. He then spent approximately two hours interviewing each victim. At trial, he testified as to the reasons why sexual relations between physicians and their patients are prohibited and to the concept of transference in which psychiatric patients have inaccurate preconceptions regarding their doctor's intelligence, wisdom and ability to heal.

. . . .

He concluded, within a reasonable degree of medical certainty, that Rebecca was not able to appreciate the nature of her sexual conduct with the defendant because of her mental illness and her belief that the conduct was part of her treatment. Additionally, he opined that she was unable to express her unwillingness to act because of her illness, as well as her dependence on the defendant and the prescription medication he was providing her.

Dr. Richard Scott, a psychologist and certified forensic examiner, also evaluated Rebecca. He reviewed her medical records and conducted a three-hour interview. Dr. Scott is employed by the Missouri Department of Mental Health as the Program Director for the Forensic Evaluation Program. During the interview, he described Rebecca as very, very nervous, she had a tremor in her hands, her voice quivered, and she was very, very anxious. He diagnosed her as having a personality disorder with dependant features, a severe bi-polar disorder, post-traumatic stress disorder related to her history of rapes, and Benzodiazepine dependence. He believed that Rebecca was suffering from these disorders at the time she was sexually abused by the defendant.

. . . .

Dr. Scott opined that, within a reasonable degree of psychological certainty, Rebecca was not able to appreciate the nature of her sexual conduct with the defendant as the result of her mental disorders, in that she was unable to discern that she was engaging in sex rather than therapy. Additionally, stated within a reasonable degree of certainty, she was unable to express her unwillingness to participate in the sexual activity. His opinion was the result of the interaction of Rebecca's

3

dependence on the prescription medication with the defendant's manipulation and abuse of the transference and her "very strong personality disorder."

The defendant admitted that the sexual part of his relationship with Rebecca began in November 1993, and that there was some form of sexual contact with her in every session until January 1994. He admitted prescribing various medications for her, and he realized that she was very addicted to Benzodiazpines as early as 1991. He also admitted that he told Rebecca that he would have her hospitalized if she refused to take her medications.

JEAN

In February 1988, Jean took her son to the defendant for treatment and was told that her son's problems stemmed from her own. At the defendant's suggestion, she agreed to seek treatment for her son from another doctor elsewhere and that Jean should continue her therapy with him. Over the six years of treatment, the defendant prescribed her Prozac, Trazodone, and Xanax.

Early on in the sessions with Jean, the defendant encouraged open discussion of sexual matters. Over time, the physical, and eventually sexual, contact between them increased during their sessions. In August 1988, the defendant explained that "it was time for us to start the sexual part of our therapy." Jean believed that this was the next step in her treatment. By 1990, the defendant introduced her to "reparenting therapy" or "regression therapy." The defendant lead Jean to believe that she had been sexually abused as a small child, probably by her father, although she did not have any recollection of abuse. The defendant engaged in "guided imagery" by which he would hold Jean in his lap and feed her with a baby bottle like a child. Jean would lie on the couch, and the defendant would describe a situation in which her father placed his penis in her month. Eventually, the defendant's penis took the "place of the bottle" during the therapy. Jean testified that the defendant explained to her that "since he was a male and not female, that would be the best that he could offer me, the closest thing to being my mother." He told her that he thought she was suicidal, and that sex would be a way for her to connect with him, and he would become her "lifeline." She testified that she did not believe that she was in a "romantic relationship" with the defendant, but that it was part of the progression of her therapy.

Jean and the defendant had sexual intercourse during her therapy sessions on three occasions in late 1993. On January 1, 1994, at the defendant's office, Jean participated in various sexual acts with the defendant and his 17–year–old stepson. The defendant had intercourse with her once again on January 4, 1994, when the defendant indicated that the sexual part of her therapy was ending. Shortly thereafter, the defendant told her that he had been reported for having sex with another one of his patients (Rebecca). He then went to California, and was admitted to a sexual addiction unit. Jean traveled with the defendant's wife and stepson to

4

visit him in California, when she was also admitted to a psychiatric hospital in California where she again attempted suicide.

. . . .

Dr. John Rabun is a certified forensic examiner for the State of Missouri, and a board-certified psychiatrist who evaluates criminal defendants for mental incapacitation pursuant to Chapter 552. Dr. Rabun interviewed Jean and examined her medical records . . . .

It was his opinion, within a reasonable degree of medical certainty, that the defendant was able to "brain wash" Jean and that as a consequent, she was not able to appreciate the nature of her behavior. He explained that the defendant "indoctrinated" her to believe that the sexual conduct was a normal process of therapy in the context of her mental illness. Furthermore, it was his opinion, within a reasonable degree of medical certainty, that Jean did not have the capacity to express to the defendant her unwillingness to engage in the sexual conduct.

Dr. Jarvis also interviewed and evaluated Jean. He testified that he found her to be a "very credible person" in the context of his evaluation . . . .

. . . .

Dr. Jarvis concluded, within a reasonable degree of medical certainty, that Jean was not able to appreciate the nature of her sexual conduct with the defendant because she believed that the sexual contact was part of the treatment necessary to treat her mental difficulties. Additionally, he opined that she was unable to express her unwillingness to act because of her mental illness, and that she had gotten progressively worse over the course of her treatment with the defendant. He acknowledged that she might have been aware that she was engaging in sexual intercourse, however, such knowledge is not dispositive of whether she had the mental capacity to engage in the intercourse in the context of her mental illness.

The defendant testified that, at times, Jean would talk in a different voice and use different names. He did not know whether she was exhibiting a multiple personality or whether it was a "kind of a disassociation." With regard to Jean's mental fitness to engage in sexual relations with him, the defendant testified that "I don't know whether she was fit or not. I do know that the thought never entered my mind to consider whether she was fit or I was fit." With regard to the issue of consent, the defendant testified that "it was my responsibility more than hers." He also agreed that some element of transference existed in his relationship with both women, and he testified that he was impressed with the state's experts in this regard. He admitted that he failed to adequately monitor the drugs he provided to Jean, in that she had the ability to abuse them, and to "stocking her up" on Xanax samples.

5

> The defendant listened carefully to Jean's testimony and "found very little of it that [he] disagreed with."
>
> . . . .
>
> Additionally, a police officer who investigated the matter for the Missouri Attorney General testified about a letter written by the defendant to the editor of the local paper. It was addressed to the people of the community, asking for forgiveness. In the letter, he blamed his conduct on the "addictions to power, work, alcohol and sex," and explained that he suffered from a "form of moral insanity."

Respondent's Exhibit E, pp. 1-11; State v. Cone, 3 S.W.3d 833, 834-40 (footnotes omitted).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc), cert. denied, 469 U.S. 842 (1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[1] Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## **GROUNDS 1 AND 2**

In Ground 1, petitioner claims that the trial court violated his due process rights under Rogers v. Tennessee, 532 U.S. 451 (2001), by convicting him under a definition of "incapacitated" that was a radical departure from over 100 years of Missouri precedent without notice or fair warning. Doc. No. 1, p. 11; Doc. No. 17, p. 5. In Ground 2, petitioner asserts a claim of ineffective assistance of

---

[1] In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to a judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

trial counsel in that counsel failed to consult with and call a psychiatrist to rebut the testimony of the three state expert witnesses and failed to challenge the experts' "novel theories" on what facts constitute "incapacity." Doc. No. 1, pp. 11-12. Respondent argues that, although plaintiff procedurally defaulted Ground 1 by failing to raise the claim at trial, discussion of petitioner's properly exhausted claim of ineffective assistance of counsel for failing to raise the Rogers claim in Ground 2 necessarily requires consideration of Ground 1. Doc. No. 13, p. 5.

Furthermore, petitioner filed a motion for court order requesting a directed discussion of the applicability of Rogers on the question of whether Missouri "properly compl[ied] with accepted, gradual, incremental alteration of over 100 + years of Missouri common law doctrine on the issue of capacity." Doc. No. 17, p. 1. Petitioner claims that Missouri common law has never held that two "Sui Juris women, functioning independently in the larger society" were "incompetent to consent to sexual acts, or engage in a longstanding sexual relationship." Doc. No. 17, p. 5. In response, respondent argues that there was no violation of Rogers because the state court did not alter or expand the definition of "incapacitated" and merely applied the statutory definition to petitioner's case. Doc. No. 23, p. 3. In reply, petitioner argues that, although there is a statutory definition of "incapacitated," historical precedent defining the term cannot be ignored. Doc. No. 26, p. 2. Furthermore, petitioner argues that the statutory definition did not overrule Missouri's common law definition of "incapacitated" with an "expressed statement" like in Rogers. Doc. No. 26, p. 6.

The Missouri Court of Appeals, Western District, held that petitioner's due process claim was without merit and denied Ground 2 as to plaintiff's claim that counsel was ineffective for failing to challenge the definition of "incapacitated" used to convict him as follows:

> "To prevail on an ineffective assistance of counsel claim, [Appelllant] must show that (1) trial counsel's performance was deficient in that he failed to exercise

7

the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances and (2) the deficient performance prejudiced [Appellant]." State v. Rich, 950 S.W.2d 337, 339 (Mo. App. W.D. 1997) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). "To establish ineffectiveness, a defendant must show that counsel's representation fell below an objective standard of reasonableness." Storey, 175 S.W.3d at 125 (internal quotation omitted). "'We presume counsel to be competent, requiring proof to the contrary by a preponderance of the evidence.'" Stiers, 229 S.W.3d at 260 (quoting U, 929 S.W.2d 209, 224 (Mo. banc 1996)). "As to prejudice, a claimant must demonstrate prejudice by showing that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." James v. State, 222 S.W.3d 302, 304 (Mo. App. W.D. 2007) (internal quotation omitted). "Appellant must establish both the performance and prejudice prongs of this test in order to prevail on a claim of ineffective assistance, and if he fails to satisfy either prong, we need to consider the other." Id.

In his first point, Cone claims that the motion court clearly erred in determining that trial and appellate counsel were not ineffective for failing to challenge his prosecution as violating his right to due process. He relies on the principle that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the state nor any prior judicial decision has fairly disclosed to be within its scope." United States v. Lanier, 520 U.S. 259, 266, 117 S. Ct. 1219, 1225, 137 L.E.2d 432 (1997). He argues that the definition of incapacitated applied in his case was contrary to that adopted in the common law and that he had no notice or fair warning that his actions were criminal. He further claims that the statutes failed to give fair warning of the conduct they prohibited.

Under the applicable statutory language, "[a] person commits the crime of sexual assault in the first degree if he has sexual intercourse with another person to whom he is not married and who is incapacitated." Cone, 3 S.W.3d at 840 (quoting § 566.040.1, RSMo 1986). Similarly, "[a] person commits the crime of deviate sexual assault in the first degree if he has deviate sexual intercourse with another person to whom he is not married and who is incapacitated." Id. (quoting § 566.070, RSMo 1986). At trial Cone admitted to having performed the alleged sexual acts but challenged whether the victims were incapacitated because of their mental conditions.

On appeal, Cone contends that his patients did not share the same characteristics as the victims that had previously been deemed incapacitated under the common law and that he could not have reasonably known that the patients were legally incapacitated under the existing law when he had sexual intercourse with them. He argues that prior cases had established incapacity through evidence of impaired reality, delusional thinking, or severe developmental disability. He claims that trial and appellate counsel should, therefore, have challenged his prosecution as

> violating due process because he could not have reasonably foreseen that his actions would be deemed criminal.
>
> The bulk of the cases relied upon by Cone for the treatment of when a woman is incapacitated predate the enactment of § 556.061 (13), the applicable statutory definition of "incapacitated." The only case cited by Cone applying § 556.061(13) utilized the same definition applied by the trial court in Cone's case and found the evidence presented therein sufficient to support the defendant's conviction. See State v. Buck, 724 S.W.2d 574 (Mo. App. W.D. 1986). Buck offers no guidance related to the factual scenario presented in the case at bar.
>
> At the time Cone had sexual intercourse with the victims, "incapacitated" was defined by statute as "that physical or mental condition, temporary or permanent, in which a person is unconscious, unable to appraise the nature of his conduct, or unable to communicate unwillingness to an act." § 556.061(13), RSMo 1986. At trial, the State presented three psychiatric experts that testified that both victims were incapacitated "in that they were unable to appraise the nature of their conduct and were unable to communicate their unwillingness to act." The jury found Cone guilty after being instructed, consistent with the statutory language, "that it must find and believe from the evidence beyond a reasonable doubt that, at the time, the patient was, because of a mental condition, unable to appraise the nature of her conduct or unable to communicate her unwillingness to engage in such conduct." Cone, 3 S.W.3d at 840 . . . .
>
> Cone was convicted under the language of the statutes in effect at the time he committed his crimes. The trial court did not overrule existing law or otherwise expand the statutory language. As noted by the motion court, the "definition reads the same today as it did the day Cone stripped his victims of their ability to resist him, plied them with drugs and alcohol, and forced them into a deviate sexual relationship under the guise of 'regression therapy.'" Any claim of breach of due process was meritless, and therefore, the motion court did not err in finding that neither trial counsel nor appellate counsel was ineffective for failing to bring such a claim. Point denied.

Respondent's Exhibit K, pp. 3-6 (footnote omitted).

In order for petitioner successfully to assert a claim for ineffective assistance of trial counsel, petitioner must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" and that "the deficient performance" actually prejudiced him. Strickland 466 U.S. at 687-88. This Court, moreover, may not grant habeas relief unless the state appellate court's

9

decision "was contrary to, or an unreasonable application of, the standard articulated by the [United States] Supreme Court in Strickland." Owens v. Dormire, 198 F.3d 679, 681 (8th Cir. 1999), cert. denied, 530 U.S. 1265 (2000).

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting Strickland, 466 U.S. at 689). Petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687.

Under Rogers, "a judicial alteration of a common law doctrine of criminal law violates the the principle of fair warning, and hence must not be given retroactive effect, only where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct at issue.'" Rogers, 532 U.S. at 462 (quoting Bouie v. City of Columbia, 378 U.S. 347, 354 (1964)).

The state court identified that the majority of the case law petitioner presents as evidence of the trial court's break from previous definitions of "incapacitated" predates the statute under which plaintiff was convicted. Respondent's Exhibit K, p. 5. Furthermore, the state found that the one case presented by petitioner that was decided after the relevant statutory construction of "incapacitated" applied the statutory definition under which petitioner was convicted and upheld the conviction based on the evidence. Id. Respondent cites Mo. Rev. Stat. § 1.010 (2000) for the proposition that "[w]hen the Missouri General Assembly passes a statute that conflicts with or supersedes the common law, the statute prevails." Doc. No. 23, p. 4. In reply, however, petitioner contends that respondent's interpretation of Section 1.010 is incorrect. Doc. No. 26, pp. 4-5.

Ultimately, the Missouri Court of Appeals, Western District, found that the court did not

10

expand or apply a different definition to "incapacitated" as defined by the statute under which petitioner was charged. Respondent's Exhibit K, pp. 3-6. Therefore, in applying the standard in <u>Strickland,</u> the state court held that petitioner's counsel was not ineffective for failing to raise an objection that was without merit. <u>Id</u>. Because the state court's determinations were not based upon "unreasonable determination[s] of the facts in light of the evidence" or misapplications of "clearly established Federal law," 28 U.S.C. § 2254(d)(1) and (2), Ground 1 and Ground 2 as to petitioner's claim that counsel was ineffective for failing to object to the definition of "incapacitated" used to convict him will be denied. Similarly, petitioner's motion for court order (Doc. No. 17) will be denied.

The Missouri Court of Appeals, Western District, denied Ground 2 as to petitioner's claim that counsel was ineffective for failing to call a psychiatrist to rebut the testimony of the three state expert witnesses as follows:

> In his second point, Cone claims, that the motion court should have found that counsel was ineffective for failing to call an expert in psychology or psychiatry to rebut the State's evidence that the victims were incapacitated. He claims that a reasonably competent attorney would have located and called such an expert.
>
> "To show ineffective assistance by failing to locate and present expert witnesses, Movant has the burden to show such experts existed at the time of trial, that they could have been located through reasonable investigation, and the testimony would have benefitted the defense." <u>Williams v. State</u>, 226 S.W.3d 871, 873 (Mo. App. S.D. 2007) (internal quotation omitted).
>
> The record reflects that, during a pre-trial hearing thirteen days before trial, trial counsel informed the court that, while he felt the defense would benefit from expert testimony, he had contacted ten to twelve psychiatrists and visited the Menninger Clinic in Topeka, Kansas, but had been unable to find an expert willing to testify in the case. Counsel also testified that Cone had unsuccessfully attempted to convince some of his colleagues to testify on his behalf. He further noted Cone's inability to pay more than a couple thousand dollars to an expert. The trial court commented that counsel appeared to have done all he could do with regard to obtaining an expert to testify on Cone's behalf.

11

The morning of Cone's trial, Cone told counsel that he had received a message from a third party that an expert in Topeka, Dr. Gilbert Parks, was willing to testify in the case on Wednesday of that week. Counsel stated that he had not spoken with the expert and did not know what his testimony would be. Cone also indicated that he had not spoken with the expert and had not seen his curriculum vitae. The State objected to the endorsement of the witness on the day of trial, and the court sustained that objection.

At the evidentiary hearing, Cone entered into evidence the deposition of Dr. William Logan. He claimed that a reasonably competent attorney would have located Dr. Logan or a similar expert to testify on his behalf.

Following the Rule 29.15 evidentiary hearing, the motion court found that trial counsel had made significant efforts to find expert witnesses to testify on Cone's behalf. The court determined that counsel had conducted a reasonable investigation for an expert and had acted in a competent manner in deciding to proceed to trial at the initial pretrial hearing.

The motion court's conclusion that counsel acted competently is not clearly erroneous. Counsel made a diligent but unsuccessful effort to obtain an expert to testify at trial. Counsel is not required to continue consulting experts until he or she has found one that will support the defendant's case. State v. Ashley, 940 S.W.2d 927, 933-34 (Mo. App. W.D. 1997). The mere fact that the defendant was able to later obtain an expert that would have provided an opinion supporting the defense does not establish that counsel could have found such an expert at the time of trial or that they were ineffective for failing to do so. Id. "While defense counsel could have continued to consult additional experts in the hope of finding one that might support [the defense], counsel is not required to seek out an expert who might provide more helpful testimony." Worthington v. State, 166 S.W.3d 566, 575 (Mo. banc 2005). Point denied.

Respondent's Exhibit K, pp. 6-8 (footnote omitted).

Because the state court's determinations that counsel made a diligent effort to obtain an expert to testify at trial and that counsel was not ineffective as a result were not based upon "unreasonable determination[s] of the facts in light of the evidence" or misapplications of "clearly established Federal law," 28 U.S.C. § 2254(d)(1) and (2), Ground 2 as to petitioner's claim that counsel was ineffective for failing to call an expert witness will be denied.

## GROUND 3

12

In Ground 3, petitioner asserts another claim of ineffective assistance of trial counsel in that counsel failed to file a motion seeking a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), in order to challenge the affidavit of probable cause that supported his arrest warrant. Doc. No. 1, pp. 12-13. The Missouri Court of Appeals, Western District, denied Ground 3 as follows:

> In his final point, Cone claims that the motion court erred in determining that counsel was not ineffective for failing to challenge the affidavit of probable cause used to support his arrest warrant. Cone asserts that the affidavit contained statements made with reckless regard for the truth because they were based on expert opinions not widely accepted in the field of psychiatry and that the arrest warrant could have successfully been challenged under Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L.E.2d 667 (1978). Specifically, Cone challenges the statement made by the special prosecutor in the affidavit that he had reviewed the reports of the psychiatric examinations of the victims by three doctors, each of whom had opined that the victim that they examined had been unable to appreciate the nature of their conduct in engaging in sexual activities with Cone and was unable to communicate her unwillingness to engage in the sexual acts requested by Cone. Cone claims the prosecutor recklessly relied upon those comments because he knew the doctors were applying a standard of incapacity contrary to existing law.
>
> In Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L.E.2d 667 (1978), the United States Supreme Court held that:
>
>> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.
>
> Id. at 155-56, 98 S. Ct. at 2676. Even assuming that Franks applies to challenges to arrest warrants as well as search warrants, Cone has failed to identify any evidence that would have needed to be suppressed as fruit of that arrest warrant. Accordingly, he has not established any prejudice from counsel's failure to make a Franks challenge to the affidavit supporting his arrest warrant.

13

> Moreover, Cone's <u>Franks</u> claim is based primarily upon an assertion that the statements of the doctors that the special prosecutor relied upon were false. "Merely to allege that the affidavit contained false information does not suffice. The defendant must also show that the *affiant* knew of the falsity or submitted the affidavit with reckless disregard for its truth or falsity." <u>State v. Leisure</u>, 772 S.W.2d 674, 683 (Mo. App. W.D. 1989) (overruled on other grounds in Joy v. Morrison, 254 S.W.3d 885, 888 n.7 & 888-89 (Mo. banc 2008)) (emphasis added). "Although challenges to the truthfulness of such affidavits are permitted . . ., the deliberate falsity whose impeachment is permitted is only that of the affiant, not of any nongovernmental informant." <u>State v. Gilmore</u>, 665 S.W.2d 25, 29 (Mo. App. E.D. 1984).
>
> As to his claim that the prosecutor recklessly relied upon the doctors' opinions because he knew the doctors were applying a standard of incapacity contrary to existing case law, as noted supra, the applicable definition of "incapacitated" is set forth in § 556.061(13). Nothing in the affidavit indicates that the doctors or the special prosecutor applied a contrary definition.
>
> The motion court properly found that the failure to file a motion to suppress under Franks did not constitute ineffective assistance of counsel. Point denied.

Respondent's Exhibit K, pp. 8-10.

To successfully assert a claim of ineffective assistance of trial counsel, petitioner must show that his counsel's representation was objectively unreasonable and that counsel's actions actually prejudiced him. <u>Strickland</u> 466 U.S. at 687-88. To satisfy the prejudice prong, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." <u>Id</u>.

The Missouri Court of Appeals, Western District, found that, even if <u>Franks</u> applies to petitioner's claim, (1) petitioner failed to show that counsel's failure to file a motion seeking a hearing prejudiced him, because he failed to identify the evidence that would have been suppressed as fruit of the arrest warrant; and (2) nothing in the affidavit indicated that the doctors or the special prosecutor applied a contrary definition to the statutory definition of "incapacitated." Respondent's

14

Exhibit K, pp. 8-10. Because the state court's determinations were not based upon "unreasonable determination[s] of the facts in light of the evidence" or misapplications of "clearly established Federal law," 28 U.S.C. § 2254(d)(1) and (2), Ground 3 will be denied.

## GROUND 4

In Ground 4, petitioner argues that the trial court improperly sentenced petitioner by changing the jury recommendation of a seven year prison term to 133 years by having the nineteen sentences run consecutively, in violation of Mo. Rev. Stat. § 557.036.1 and 3. Doc. No. 1, pp. 12-14. Respondent argues that, even though petitioner procedurally defaulted Ground 4, his claim is without merit, because petitioner does not have a federal constitutional right to a jury determination of whether sentences run concurrent or consecutive. Doc. No. 12, pp. 10-11. Respondent argues that judges have the discretion to impose concurrent or consecutive sentences under Mo. Rev. Stat. § 558.026.1 (2000). Doc. No. 13, p. 11.

Because the trial judge's discretion to run sentences consecutively hinges on the impact of Mo. Rev. Stat. §§ 558.026.1 and 557.036, petitioner primarily presents an issue of state law. As a result, petitioner's claim that the trial court judge erred in running petitioner's sentences consecutively fails to state a claim actionable under federal habeas. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("'federal habeas corpus relief does not lie for errors of state law'") (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Therefore, Ground 4 will be denied.

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." Tennard v. Dretke, 542 U.S. 274, 276 (2004).

15

Because petitioner has not met this standard, a certificate of appealability will be denied. See 28 U.S.C. § 2254, Rule 11(a).

Accordingly, it is **ORDERED** that:

(1) petitioner's motion for court order (Doc. No. 17) is denied;

(2) the petition for writ of habeas corpus is denied;

(3) the issuance of a certificate of appealability is denied; and

(4) this case is dismissed with prejudice.

      /s/ Gary A. Fenner
GARY A. FENNER
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated: February 29, 2012 .